

# NUMBER 13-17-00558-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

NATURAL SODA LLC AND
ENIRGI GROUP CORPORATION,                                    Appellants,

v.

BUNNETT & CO., INC, ENERGY FEEDS
INTERNATIONAL, LLC AND WILLIAM
E. BUNNETT,                                                  Appellees.

On appeal from the 200th District Court
of Travis County, Texas.

# MEMORANDUM OPINION

**Before Justices Benavides, Perkes, and Tijerina**
**Memorandum Opinion by Justice Tijerina**

Appellants and cross-appellees, Natural Soda LLC and Enirgi Group Corp. (collectively "Natural Soda") appeal the trial court's judgment in favor of appellees and cross-appellants, Energy Feeds ("Energy"), Bunnett & Co., Inc., and William Bunnett

(collectively "Bunnett"). By seven issues, which we have renumbered and reorganized, Natural Soda contends that: (1) the evidence is insufficient to support the jury's findings on several questions of fact (issues one through five); (2) Bunnett's damages for future lost profits are barred as a matter of law (issue six); and (3) the trial court improperly instructed the jury that "Natural Soda materially failed to comply with the Agreement on December 2, 2015, by terminating the Agreement in violation of the (10) ten-day provision" (issue seven).[1]

By three issues, cross-appellant, Energy contends that: (1) the trial court erred by failing to submit a question to the jury regarding Energy's "claim against Natural Soda for participating in breach of fiduciary duty";[2] (2) the trial court improperly implicitly granted a directed verdict in favor of Natural Soda regarding Energy's breach of fiduciary claim; and (3) the trial court materially misstated Texas law by instructing the jury "that it was not a breach of fiduciary duty for the general manager while still employed to take active steps to compete with his employer and secretly do so in concert with his employees."

By six issues, which we have reorganized and renumbered, Bunnett contends that: (1) the "express contract rule" bars Natural Soda's quasi-contract claim (issue one); (2) the evidence is insufficient to support the amount of damages awarded to Natural Soda on its quasi-contract claim (issue two); (3) the trial court misstated Texas law in the jury charge[3] (issue three); and (4) the trial court erred by (a) requiring Bunnett to elect its

---

[1] This case is before this Court on transfer from the Third Court of Appeals in Austin pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

[2] Energy did not have a contract with Natural Soda. Energy's claims against Natural Soda arose from Energy's accusation that Natural Soda impacted Energy's contract with its supplier of palm oil, Wawasun.

[3] In its brief, Bunnett has adopted and incorporated Energy's third issue as its third issue.

damages, (b) reducing Bunnett's exemplary damages, and (c) refusing to award exemplary damages to Bunnett, (issues four and five). We affirm in part and reverse and render in part.

## I. BACKGROUND

Natural Soda, a Colorado company, produces sodium bicarbonate (bicarb), which is used for, among other things, animal feed. Bunnett distributes bicarb to end users, who mainly use it for animal feed supplements. Energy distributes bypass fat referred to by the parties as palm oil, which is also used for animal feed supplements. William Bunnett, the founder of Bunnett, is the president of Bunnett & Co., Inc. and Energy. William's son, J.J. Bunnett, is the chief operations officer of Bunnett.

Natural Soda and Bunnett first entered into a contract for the supply and sale of bicarb in 2005 (the "Agreement"). The Agreement provided that Bunnett was the exclusive sales representative for soliciting orders of bicarb in fifteen states. Bunnett contracted with its customers and collected payment directly from them. After the customers paid Bunnett, Bunnett paid Natural Soda. The Agreement automatically renews every year unless one of the parties notifies the other of its intent to terminate ninety days prior to the annual expiration. Under certain circumstances, the Agreement permitted Natural Soda to terminate it by providing Bunnett ten days' notice. In either instance of termination, the Agreement required for Natural Soda to accept bicarb orders from Bunnett for ninety days, and Bunnett was required to pay for those orders.

Apparently, the parties continued renewing the Agreement, without issues. In April 2010, according to the parties, they executed an amendment to the Agreement extending its term to September 8, 2016. On October 23, 2015, one of Bunnett's sales associates,

3

Frank Dores, resigned. A few days later, two other sales associates, Ray Gearhart and John Franklin, also resigned from Bunnett.[4]

On December 2, 2015, Natural Soda terminated the Agreement early, claiming that Bunnett had breached the Agreement. Natural Soda continued to supply Bunnett with bicarb after the termination pursuant to the Agreement's terms. According to Natural Soda, Bunnett refused to pay for the post-termination supply in the amount of $3.4 million. Bunnett sued Natural Soda for breach of contract and tortious interference with business relationships, among other things. Natural Soda countersued for breach of contract and quantum meruit, among other things. The case proceeded to a jury trial.

The jury awarded Bunnett damages for both its breach of contract and tortious interference with business relations claims. Bunnett elected to collect its damages for breach of contract, which the trial court rendered in its judgment. The jury found that Bunnett breached the contract after Natural Soda terminated the Agreement on December 2, 2015; however, it found that Bunnett's breach was excused. The jury awarded damages to Natural Soda for its quantum meruit claim. This appeal followed.

## II.    SUFFICIENCY OF THE EVIDENCE

By its first through third issues, Natural Soda contends the evidence is insufficient to support the jury's findings that (a) Bunnett did not breach the contract first, (b) Natural Soda's breaches caused Bunnett harm, and (c) Bunnett is entitled to lost profits.[5]

## A.    Standards of Review

---

[4] Bunnett alleges that Natural Soda encouraged the resignations.

[5] We note that all parties conceded in the trial court that Colorado law applies to the breach of contract claims. Accordingly, where appropriate, we will apply Colorado law to those issues relating to the breach of contract claim.

A legal sufficiency challenge will be sustained when the record shows: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id*. at 827. We review the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable fact-finder could and disregarding any contrary evidence unless a reasonable fact-finder could not. *Id*. at 821–22, 827. In our review, we are mindful that the jury remains the sole judge of witnesses' credibility and the weight to be given to their testimony. *Id.* at 819–20. Moreover, in our legal sufficiency review, we must show deference to the jury's resolution of conflicts in the evidence, and we must presume that the jury resolved all conflicts in favor of the verdict. *Id.* at 820–21.

A party who challenges the legal sufficiency of the evidence to support an issue upon which he did not have the burden of proof at trial must demonstrate on appeal that there is no evidence to support the adverse finding. *Luce v. Interstate Adjusters, Inc.*, 26 S.W.3d 561, 566 (Tex. App.—Dallas 2000, no pet.) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). When reviewing a "no evidence" point, we determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. A "no evidence" or legal insufficiency point is a question of law challenging the sufficiency of the evidence to support a particular fact finding. *In re Estate of Livingston*, 999 S.W.2d 874, 879 (Tex.

5

App.—El Paso 1999, no pet.).

When a party attacks the legal sufficiency of an adverse finding on an issue on which that party has the burden of proof at trial, the complaining party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Up Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). We review a matter of law challenge by first examining the record for evidence that supports the adverse finding, while ignoring all evidence to the contrary. *Id*. If we do not find evidence to support the finding, we will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id*. "The point of error should be sustained only if the contrary proposition is conclusively established." *Id*.

We examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding in our factual sufficiency review. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). In reviewing a factual-sufficiency challenge to a finding on an issue on which the appellant did not have the burden of proof, we will set aside the verdict "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). "In reviewing a factual-sufficiency challenge to a jury finding on an issue on which the appellant had the burden of proof, the appellant must show that 'the adverse finding is against the great weight and preponderance of the evidence.'" *Editorial Caballero, S.A. de C.V. v. Playboy Enter., Inc.*, 359 S.W.3d 318, 329 (Tex. App.—Corpus Christi–Edinburg 2012, pet. denied) (citing *Dow Chem. Co.*, 46 S.W.3d at 242).

The fact-finder is the sole judge of the witnesses' credibility and may choose to believe one witness over another. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d

757, 761 (Tex. 2003). We may not substitute our own judgment for that of the jury, even if we would reach a different answer based on the evidence. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (citing *Maritime Overseas Corp.*, 971 S.W.2d at 407).

**B.     Bunnett Did Not Breach the Contract Before Natural Soda**

By its first issue, Natural Soda contends that because the evidence established that Bunnett breached the contract first prior to December 2, 2015, the evidence is legally and factually insufficient to establish that Natural Soda committed the first material breach by terminating the Agreement early on December 2, 2015. Thus, Natural Soda argues its breach was excused. Specifically, Natural Soda challenges the evidence to support the jury's answer to Question No. 3, asking: "Was Natural Soda's failure to comply with the [Agreement] excused because [Bunnett] first failed to comply with a material obligation of the [Agreement] prior to December 2, 2015." The jury answered, "No."

At trial, Natural Soda had the burden of proof on its claim that it was excused from its breach of the Agreement because Bunnett "failed to comply with a material obligation of the" Agreement prior to December 2, 2015. *See Dow Chem.*, 46 S.W.3d at 241. Natural Soda argues it did so because the evidence shows that Bunnett breached the Agreement first by: (1) "Losing 100% of its sales force"; (2) "Ruining its relationships with sodium bicarbonate customers, harming Natural Soda's goodwill"; (3) "Failing to pay Natural Soda for product within 45 days of shipment"; (4) "Failing to keep Natural Soda informed regarding its sales negotiations or providing the quotations provided to customers"; and (5) "Taking commissions exceeding the contract rates."

**1.     "Losing 100% of Its Sales Force"**

7

It is undisputed that in October 2015, three of Bunnett's sales associates resigned. Natural Soda argues that the Agreement required that Bunnett "maintain adequate personnel to ensure competent and thorough coverage of the Sales Territory" and "[b]y any measure, when a distributor loses all of its sales representatives at the peak of the sales season, the distributor has failed to maintain an adequate sales force"; thus, the jury should have found that Bunnett breached the Agreement when the three sales associates resigned.[6]

Bunnett responds that although three of its sales representatives resigned in October 2015, nonetheless, the evidence showed that it had an adequate sales force. We agree with Bunnett. The jury heard evidence that William had a lot of contacts in the industry and was experienced selling bicarb and dealing with customers. There is evidence that J.J. also sold bicarb and "had a lot of experience managing sales teams." One of Bunnett's employees, Mike Nolan, testified that J.J.

> conducts sales calls pretty much every week, tracks how our sales are progressing throughout the month. Provides mentorship where it's needed and provides clear objectives to our sales people and one thing we've been doing a little bit differently is we have very clear objectives on what we need to do and we establish strategy on how to accomplish those goals.

In addition, Bunnett presented evidence that its other employees, Nolan and Conni Waddle, each had experience selling bicarb and that Bunnett had hired several new sales associates to help with sales. Bunnett also presented evidence that the Agreement required for Bunnett to sell 40,000 tons of bicarb in 2015, the year that Natural Soda terminated the Agreement, and Bunnett had surpassed the requirement by selling 90,000 tons in 2015. Moreover, the Agreement did not allow for termination unless Bunnett failed

---

[6] This is the extent of Natural Soda's argument.

to reach the quarterly goals for two consecutive quarters, which had not occurred. From this evidence, the jury could have reasonably concluded that Bunnett maintained an adequate sales force, and we must assume that the jury resolved any conflicts in the evidence in favor of Bunnett. *See City of Keller*, 168 S.W.3d at 820–21. Therefore, based on the evidence presented, we conclude that there is legally sufficient evidence to support the jury's finding that Bunnett maintained an adequate sales force, and we conclude that Natural Soda did not prove as a matter of law that Bunnett failed to comply with the Agreement by "losing 100% of its sales force."

### 2. "Ruining its relationships with sodium bicarbonate customers, harming Natural Soda's goodwill"

Natural Soda claims that the jury should have found that Bunnett failed to "maintain good working relationships with Natural Soda's customers" in violation of the "good will provision" of the Agreement. To support its position, Natural Soda cites evidence that some of Bunnett's customers complained about Bunnett's customer service and some customers stated that they were unwilling to do business with Bunnett due to a variety of reasons. Bunnett responds that the evidence was, at best, conflicting regarding when the customers lodged their complaints about Bunnett.

First, Natural Soda cites testimony from Vincent Cline of Pacific Elements that Bunnett's customer service was "horrible." However, when asked if Pacific Elements would now "refuse to do business" with Bunnett, Cline stated "No" and stated that Pacific Elements had continued to do business with Bunnett after experiencing such "horrible" service. Notably, Cline did not state that Pacific Elements believed that Natural Soda's reputation had been affected by Bunnett's "horrible" customer service. In addition, Cline did not clarify when Bunnett's customer service was "horrible." And, most importantly,

9

Cline was not asked and did not state that he informed anyone at Natural Soda of Bunnett's alleged "horrible" customer service prior to Natural Soda's termination of the Agreement on December 2, 2015. Thus, the jury could have reasonably found that because Cline never informed Natural Soda of its concerns, those concerns could not have been the basis of Natural Soda's termination of the Agreement.

Next, Natural Soda cites evidence that another of Bunnett's customers, Animal Nutrition Systems, "would rather not do business with Bunnett." Rosemarie Burgos-Zimbelman, the chief operating officer of Animal Nutrition Systems, testified that on December 1, 2015, she sent an email to Natural Soda stating that Animal Nutrition Systems did not want to continue purchasing bicarb from Bunnett. However, Burgos-Zembelman also testified that Animal Nutrition Systems was willing to buy the bicarb directly from Natural Soda. Thus, although this evidence supports a finding that Animal Nutrition Systems no longer wished to conduct business with Bunnett, this evidence does not support a finding that Natural Soda's goodwill had been affected. Moreover, evidence was presented that Natural Soda's employee, Sara Schaeffner had already drafted the termination letter prior to December 1, 2015 and was holding it until then. Thus, the jury could have reasonably found that Burgos-Zimbelman's complaint did not support a finding that Bunnett failed to maintain a good relationship with its customers or affected Natural Soda's reputation and goodwill.

Next, Natural Soda cites testimony from Todd Gearhart, an employee with J.D. Heiskell and customer of Bunnett, that "I don't want to have any dealings to do with [the] Bunnetts anymore." However, when asked if he ever complained about the quality of Bunnett's service to Natural Soda, Gearhart replied, "No." Moreover, Gearhart explained

10

that he no longer wanted to purchase bicarb from Bunnett because Gearhart was upset when Bunnett "had cut [him] off on palm" oil, and he had to buy the palm oil on the open market. Gearhart did not attribute his unwillingness to conduct business with Bunnett on any other basis. In fact, Gearhart testified that he would have purchased bicarb from Bunnett depending on the price, timeframe, and offers from other companies. In addition, Gearhart contracted to buy bicarb directly from Natural Soda, like Animal Nutrition Systems, after it ceased purchasing bicarb from Bunnett. Thus, the jury could have reasonably found that Gearhart's complaint did not support a finding that Bunnett breached the Agreement.

Natural Soda also cites testimony from Brian D'Ewart, an employee with Dewco and Bunnett's customer, that Dewco no longer wanted to conduct business with Bunnett. D'Ewart did not specify the reason Dewco no longer wanted to do business with Bunnett. And, he testified that he did not recall any problems with Dewco's supply of bicarb in 2015. D'Ewart never stated that he told Natural Soda of his unwillingness to purchase bicarb from Bunnett. Thus, the jury could have reasonably found that Dewco's desire to stop buying bicarb from Bunnett could not have been the reason Natural Soda terminated the Agreement as there is no evidence that Natural Soda was aware of D'Ewart's unwillingness to conduct business.

Finally, Natural Soda cites Natural Soda's employee Jackie Deiter's testimony that several of Bunnett's customers called her and were "very upset" and the "accounts were in jeopardy." Deiter did not elaborate on the reason that the customers were upset or why the accounts were in "jeopardy." Deiter explained that when she contacted Bunnett about these customers, she was told "[t]hat everything was fine." Natural Soda also cites

11

Deiter's testimony regarding her receipt of a spreadsheet, invoices, and customer contracts sent to her on November 17, 2015. Natural Soda does not explain how this testimony establishes that Bunnett failed to protect Natural Soda's goodwill and maintain good customer relationships, and we cannot discern the connection of this testimony to that issue. *See* TEX. R. APP. P. 38.1(i). Accordingly, the jury could have reasonably found that this testimony did not support such a finding.

Therefore, based on the evidence presented, we conclude that the evidence is legally sufficient to support the jury's finding that Bunnett did not breach the Agreement, and Natural Soda did not prove as a matter of law that Bunnett failed to maintain good relationships with its customers or damaged Natural Soda's good will.

### 3. "Failing to pay Natural Soda for product within 45 days of shipment"

Natural Soda argues that Bunnett breached the Agreement by failing to make timely payments prior to December 2, 2015. Bunnett responds that the breach was not material because the delay in payments was inherent in the way the parties had conducted business over many years.

At trial, Waddle testified that due to the nature of Bunnett's business practices, she sometimes sent payments to Natural Soda more than forty-five days after receiving the invoices. She elaborated that "some weeks we were a little off." According to Waddle, although Bunnett received daily invoices from Natural Soda, she paid all invoices on Friday by wiring money to Natural Soda. Waddle explained that she had paid the invoices in this fashion for the fifteen years she worked at Bunnett. Waddle stated that "occasionally" she received requests from Natural Soda for an extra payment at the end of the quarter, and she would make the extra payment. However, Natural Soda never

12

requested that Bunnett pay the invoices daily, which Waddle stated would be impractical.

The jury was instructed that: "A material term of an agreement goes to the root of the matter or essence of the agreement"; and "Materiality must be assessed in the context of the expectations of the parties at the time the agreement was formed." The charge further instructed, "You should consider the importance or seriousness of the failure to comply with the agreement and the likelihood that the other party will still receive substantial performance despite the failure to comply with the agreement." Under Colorado law, "a breach that is material 'goes to the root of the matter or essence of the contract and renders substantial performance under the contract impossible.'" *See Interbank Invs., L.L.C. v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224, 1229 (Colo. App. 2000) (quoting 6 W. Jaeger, Williston on Contracts § 842 at 165 (3d ed.1962)). Thus, the jury was instructed of the definition of materiality pursuant to Colorado law.

Here, Bunnett's occasional late payments did not render substantial performance under the Agreement impossible. *See id*. More importantly, evidence was presented that it was Natural Soda's practice to accept late payments from Bunnett for the entire fifteen years that Waddle worked at Bunnett. Accordingly, giving deference to the jury, we conclude that there is some evidence to support the jury's finding that Bunnett's late payments were not a material breach of the Agreement. *See Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005) ("The trier of fact should consider the importance or seriousness of the breach and the likelihood that the injured party will nonetheless receive substantial performance."); *Interbank Invs., LLC*, 12 P.3d at 1229.

### 4. "Failing to keep Natural Soda informed regarding its sales negotiations or providing the quotations provided to customers"

Natural Soda claims that Bunnett breached the Agreement by failing to provide

13

certain sales information to Natural Soda. Bunnett responds that there is evidence that when Schaeffner requested the reports containing the complained-of information on November 9, 2015, Bunnett provided the information to her on November 17, 2015.

The evidence is undisputed that Bunnett provided the complained-of information to Natural Soda on November 17, 2015. Furthermore, on cross-examination, Dieter claimed to have created a spreadsheet based on her "SWAG" or "Strategic Wild Ass Guess" system. Upon comparison of the November 17, 2015 spreadsheet and Dieter's SWAG spreadsheet, Dieter admitted that the numbers matched for seventeen of the twenty categories. Dieter claimed that her SWAG system was very effective and stated that she was proud that she did such a great job at guessing the amounts for the categories on the spreadsheet. Dieter consistently maintained that she made the spreadsheet without any data from Bunnett. Nonetheless, the jury could have reasonably found Dieter's testimony unbelievable and could have found that because Dieter's spreadsheet so accurately matched the spreadsheet provided by Bunnett, she had not relied on her SWAG system but had relied on information provided by Bunnett. *See Scott v. Gibson Oil Co.*, 471 S.W.2d 924, 926 (Tex. Civ. App.—Tyler 1971, no writ) ("It was within the jury's province to judge the credibility of the witnesses and the weight to be given their testimony, and to resolve conflicts and inconsistences in the testimony of any one witness as well as the testimony of different witnesses.").

Moreover, the jury could have reasonably found that Bunnett did not breach the Agreement because it provided the requested information on November 17, 2015.[7]

_____

[7] Natural Soda generally asserts that the information provided by Bunnett was inaccurate or incomplete. However, as previously stated, Dieter testified that her spreadsheet was almost identical to the

14

Finally, as explained above, the jury was instructed that a breach is not material unless the breach renders substantial performance under the contract impossible. *See Interbank Invs., LLC*, 12 P.3d at 1229. Natural Soda does not contend that this breach, if any, rendered substantial performance under the contract impossible, and here, there is no evidence supporting a conclusion that Bunnett's alleged failure to provide the requested information did so. *See id*. And, as previously stated, Bunnett did provide the information on November 17, 2015. Accordingly, giving deference to the jury, we conclude that there is sufficient evidence to support the jury's finding that Bunnett did not breach the Agreement in this manner.

### 5.  "Taking commissions exceeding the contract rates"

Finally, Natural Soda contends that the jury should have found that Bunnett breached the Agreement because the evidence established that in November 2015, Bunnett was "routinely" "taking commissions exceeding the contract rates." Specifically, Natural Soda claims that although the Agreement limited Bunnett to commissions of 10% or ten dollars, there is evidence that Bunnett "took more than 10% or ten dollars commissions for over 30 different types of customer orders." The provision of the Agreement cited by Natural Soda states the following: "Distributor shall earn a commission equal to the greater of either $10 per ton or ten percent (10%) of the Net Sales Price on sales of product procured by Distributor." Natural Soda cites a spreadsheet, provided by Bunnett and admitted at trial, showing that in a column labeled "Comm. %," there are various percentages listed between five and twenty-one percent.

---

spreadsheet provided by Bunnett. Accordingly, the jury was not required to find that the spreadsheet provided by Bunnett was inaccurate or incomplete.

This is the extent of Natural Soda's argument.

At trial, William testified that Natural Soda "went around" Bunnett and "would take $7.50 a ton when it should have been like $15 a ton . . . but they said we will make this up to you on other accounts, so, you'll get a dollar or two more on the others. . . ." William said "[I]t evened out to where you had a ten percent, or, you know, some cases, we would lose some money but not argue with them because the business was growing. . . ." William stated that, for example, with the J.D. Heiskell account, Natural Soda required that Bunnett receive a commission of seven dollars per ton; however, Natural Soda agreed to make up that loss by allowing Bunnett to receive a larger commission on other accounts. Dores testified that the president of Natural Soda would tell Bunnett the amount of commission it should charge its customers. Bunnett asked, "And sometimes he demanded that you take less than a ten percent commission in order to get the price that he thought was the right price for the customer?" Dores replied, "Yeah." Dores explained that the larger customers would be charged a lower percentage of commission and then Natural Soda would "try to make it up for the smaller customers having a higher margin. But because of the volume, you know, it would offset it." Bunnett asked, "And why do you say that?" Dores responded, "Well because they would try to guarantee a ten percent, but it would have to be on a margin—I mean, the average margin, because the large accounts you can't get the same margins as you can the smaller accounts." Dores agreed that this practice continued with Natural Soda "for a number of years."

Based on the evidence presented, the jury was free to believe the claims of William and Dores that Natural Soda required that Bunnett take a smaller commission on some sales and then offset that smaller commission by allowing Bunnett to charge a larger

16

commission on other sales. Moreover, as the evidence showed that Natural Soda encouraged this practice, the jury could have reasonably found that Bunnett's acts were not material breaches of the Agreement. Accordingly, giving deference to the jury, we conclude that there is sufficient evidence to support the jury's finding that Bunnett did not breach the Agreement in this manner.

### 6. Summary

We conclude that Natural Soda has not shown as a matter of law that Bunnett breached the agreement first. Moreover, we conclude that the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We overrule Natural Soda's first issue.

### C. Natural Soda's Breaches Caused Bunnett Harm

By its second issue, Natural Soda contends there is no evidence to support the jury's finding that its breach caused Bunnett harm. Specifically, Natural Soda argues that under Colorado law, to prevail on its breach of contract claim, Bunnett was required to prove that Natural Soda's breaches caused it damages. *See W. Distrib. Co. v. Diodsio*, 841 P.2d 1053, 1058 (Colo. 1992); *see also Strock v. USA Cycling, Inc.*, No. 00-CV-2285-JLK, 2006 WL 1223151, at *6 (D. Colo. May 8, 2006) (mem. op.) ("To prove causation in Colorado, 'the plaintiff must show by a preponderance of the evidence that the injury would not have occurred but for the defendant's . . . conduct.'" (citing *Kaiser Found. Health Plan of Colo. v. Sharp*, 741 P.2d 714, 719 (Colo. 1987))).

When the opposing party fails to object to the charge, we measure the sufficiency of the evidence by the charge actually submitted to the jury and not some other law not identified in the charge. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Here, the jury

17

was asked and found that Natural Soda failed to comply with the Agreement by (1) selling bicarb in Bunnett's exclusive sales territory from December 2, 2015 to December 12, 2015 and (2) terminating the Agreement without cause on December 2, 2015. The charge asked, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [Bunnett] for its damages, if any, that resulted from Natural Soda's failure to comply with the [Agreement]" and instructed that it should calculate Bunnett's damages as follows:

    a.    Lost profits during the contract period

        [Bunnett's] lost profits, if any, during the time between Natural Soda's material failure to comply with the [Agreement] on December 2, 2015 and the expiration of the Agreement on September 8, 2016.

    b.    Future lost profits after expiration of the contract period

        [Bunnett's] future lost profits, if any, are its lost revenue resulting from Natural Soda's failure to comply, less the expenses [Bunnett] saved by not performing the work of selling Natural Soda's [bicarb], after the expiration of the [Agreement] on September 8, 2016.

Natural Soda did not submit or request a question asking whether Natural Soda's breaches caused Bunnett's damages under Colorado law, and it did not object to the charge's failure to include such a question. *See Morales v. Morales*, 98 S.W.3d 343, 346 (Tex. App.—Corpus Christi−Edinburg 2003, pet. denied) ("If the complaint concerns an omission, the party must request and tender a substantially correct instruction in writing." (citing TEX. R. CIV. P. 278)). Thus, the jury was not asked to determine causation pursuant to Colorado law. In addition, Natural Soda has not complained on appeal of the omission in the charge of a question regarding causation under Colorado law. Because we evaluate the sufficiency of the evidence against the charge as submitted and Natural Soda did not submit a request under Colorado law, Natural Soda's contention that there is no evidence

18

showing that its breaches caused Bunnett's damages under Colorado law is irrelevant to the jury's finding that Bunnett's damages "*resulted* from Natural Soda's failure to comply with the [Agreement]." (Emphasis added).

Here, the jury found that Natural Soda's selling bicarb in Bunnett's exclusive sales territory and termination of the Agreement without cause resulted in Bunnett's lost profits. However, on appeal, Natural Soda does not specifically challenge these jury findings. In other words, Natural Soda does not argue that there is no evidence to support the jury's findings that Bunnett suffered damages as a result of Natural Soda's selling bicarb in Bunnett's exclusive sales territory or as a result of Natural Soda's termination of the Agreement. TEX. R. APP. P. 38.1(i);*see also Tristan v. C.A. Walker, Inc*., No. 13-01-410-CV, 2003 WL 21212342, at *5 (Tex. App.—Corpus Christi–Edinburg May 27, 2003, pet. denied) (mem. op.).

Instead, Natural Soda only argues that in order to prove causation under Colorado law, Bunnett was required to present evidence that it had another supplier and that "customers wanted to continue purchasing from Bunnett." Natural Soda cites no authority, and we find none, supporting such a conclusion. Thus, even if Natural Soda is correct that Bunnett did not prove it had another supplier and that "customers wanted to continue purchasing" from it, Natural Soda has not explained, with legal support, why the lack of such evidence in the record prevented the jury from finding that Natural Soda's selling bicarb in Bunnett's exclusive sales territory and unexcused early termination of the Agreement caused Bunnett's lost profit damages. *See* TEX. R. APP. P. 38.1(i). We overrule

19

Natural Soda's second issue.[8]

## D.     Future Lost Profits

By its sixth issue, Natural Soda contends that there is no evidence to support the amount of future lost profit damages awarded to Bunnett.[9]

First, Natural Soda argues that future lost profits are never assumed and must be established under a reasonable-certainty standard. Bunnett, on the other hand, argues that we must review the sufficiency of the evidence under Colorado law. We make no determination regarding which standard properly applies because, as further explained below, Bunnett relied on speculative expert testimony.

The charge instructed that "Bunnett's future lost profits, if any, are its lost revenue resulting from Natural Soda's failure to comply, less the expenses [Bunnett] saved by not performing the work of selling [bicarb], after the expiration of the [Agreement] on September 8, 2016." Bunnett claimed that Natural Soda failed to comply with the Agreement by wrongfully terminating it early and by selling bicarb prior to the expiration of the Agreement in Bunnett's exclusive territory. Thus, the only theory which applies to Bunnett's future lost profits is the former: Natural Soda's breach of the Agreement by

---

[8] We need not address whether the evidence established that Natural Soda's breaches caused Bunnett's future lost profits because as further explained below, Bunnett was not entitled to future lost profits.

[9] In this section of its brief, Natural Soda does not specify if it is challenging the jury's award of lost profits during the contract period or after the expiration of the contract on September 8, 2016. Natural Soda generally states in this section of its brief that "Bunnett's damages awards are entirely unsupported (Questions Nos. 4 and 17)." Question No. 4 related to Bunnett's breach of contract claim, and Question No. 17 related to its tortious interference with relationships claim. Nonetheless, in another section of its brief, Natural Soda clarifies that it is challenging future lost profits, which spanned beyond the expiration date of the Agreement and requests that we vacate the jury's award of future lost profits. Thus, it does not appear that Natural Soda is challenging the award of lost profits during the contract period. Accordingly, to the extent that Natural Soda intends to do so, we conclude that issue is not adequately briefed. *See* TEX. R. APP. P. 38.1(i).

wrongfully terminating it early.

At trial, Bunnett's expert witness, Jeff Balcombe, testified that in order to calculate Bunnett's future lost profits he assumed the following:

> [B]ut for the alleged wrongful termination of the [Agreement], Bunnett would have had a sufficient interval to arrange for a continuing supply of animal feed, [bicarb] following the end of the current [Agreement] and by either, A, renewing its contract with Natural Soda on similar terms as it had done on multiple prior occasions or by entering a similar distribution agreement with one or more of Natural Soda's competitors.

> Additionally, [Bunnett] would have continued at least the same volume of [bicarb] with any of the losses of customers through the normal course of business being offset by gains in other customers.

> Also in this analysis, this scenario, my actual world estimates that Bunnett will be unable to enter—obtain an alternative supply of bicarb. In other words, they are no longer able to sell bicarb.

Balcombe indicated that he based these assumptions on findings that the jury could reasonably make. Balcombe testified that his assumptions were reasonably based on "generally accepted methodologies, applying principles of [his] profession." Balcombe calculated damages of future lost profits for a period of ten years after the expiration of the Agreement because according to Bunnett, its relationships with the customers "date back decades," it had been purchasing bicarb from Natural Soda since 1993, and Balcombe's "statistical analysis of the customer relationship indicate the long life associated with them."

In order to prevail on its claim for future lost profits, the evidence needed to show that Natural Soda would continue its relationship with Bunnett after the Agreement expired in September 2016. However, the undisputed evidence shows that although the Agreement automatically renewed for one-year periods, either party had the right to terminate it by notifying the other party of its intent to terminate ninety days prior to the

21

expiration date. It is undisputed that Natural Soda did not intend to renew at the expiration of the Agreement, and it terminated the Agreement early. Thus, the undisputed evidence establishes that Natural Soda would not have renewed the Agreement in September 2016.

Next, in the alternative, as supporting a claim for future lost profits, Balcombe assumed that Bunnett would have entered "a similar distribution agreement with one or more of Natural Soda's competitors." However, the evidence shows that Bunnett had not found an alternate supplier in the fourteen months after Natural Soda terminated the agreement on December 2, 2015.

To recover future lost profits, a party must do more than show that it has suffered a loss. *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 859 (Tex. 2017). The party must show with reasonable certainty the amount of future lost profits, which is a fact intensive determination. *Id*. at 859−60. "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id*. at 860 (quoting and citing *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010)). Thus, "[a] party's bare assertion that a contract was lost does not establish lost profits with reasonable certainty." *Id*. "Rather, 'the general rule is that recovery of lost profits as damages is allowed 'where it is shown that a loss of profits is the natural and probable consequence of the act or omission complained of, and their amount is shown with sufficient certainty.'" *Id*. (quoting *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994)).

Future lost profits cannot be based on "uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from

22

which they may be intelligently estimated." *Id*. Instead, "[t]he law is wisely skeptical of claims of lost profits from untested ventures or in unpredictable circumstances, which in reality are little more than wishful thinking." *Id*. (quoting *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 280 (Tex. 2015)). Future lost profits have not been established with reasonable certainty if the supporting evidence is largely speculative or a mere hope for success. *Id*.

In *Horizon Health Corp. v. Acadia Healthcare Co., Inc*., the Texas Supreme Court explained that the evidence was legally insufficient to support the jury's finding that the plaintiff was entitled to future lost profits. *Id*. The court stated that a plaintiff seeking damages based on lost profits from future business opportunities must "adduce evidence establishing that prospective customers would have done business with the plaintiff absent the defendant's misconduct." *Id*. at 861. The court noted that to be entitled to future lost profits from a contract with a prospective customer, the plaintiff needed to present evidence showing that the prospective customer would have entered into a contract with it. *Id*. However, the plaintiff had not done so. *Id*. Although the plaintiff presented expert testimony of the amount of future lost profits, the court concluded the expert merely assumed that the plaintiff would have "won" the contract with the prospective customer if not for the defendants' wrongful conduct. *Id*. In fact, the plaintiff's expert stated that he did not have an opinion regarding whether the prospective customer would have contracted with the plaintiff. *Id*. Thus, the court concluded that the expert's opinion was insufficient to support a finding that the plaintiff would have contracted with the prospective customer if not for the defendant's wrongful conduct. *Id*.

Here, Balcombe stated, "[T]here are disputed facts regarding whether or not

23

[Bunnett] will be able to find an alternative supply and if so when and those are your [the jury] judgments, so, my job is to perform analysis to provide you with information so that when you're asked to review the facts and come to your decision, you have information to do so." However, Natural Soda objected, and the trial court sustained the objection instructing the jury that it should disregard that statement. And as previously stated, Balcombe merely assumed that Bunnett would have entered a similar contract with one of Natural Soda's competitors based on Bunnett's unsupported assertions. Balcombe was unable to state which of Natural Soda's competitors would have offered a contract to Bunnett and what the duration of such a contract would be. Thus, Balcombe based his opinion of future lost profits on unpredictable and unsupported circumstances. Moreover, on cross-examination, Balcombe testified that he was not stating that his assumptions were reasonable. Accordingly, we conclude that Balcombe's assumptions are speculative and do not support the award of future lost profits with reasonable certainty. *See id*; *see also AZZ Inc. v. Morgan*, 462 S.W.3d 284, 290 (Tex. App.—Fort Worth 2015, no pet.) (explaining that "'reasonable certainty' is not demonstrated when the profits claimed to be lost are largely speculative or a mere hope for success, as from an activity dependent on uncertain or changing market conditions, on chancy business opportunities, or on promotion of untested products or entry into unknown or unproven enterprises"). Having found that Balcombe's factual basis for his computation was merely speculative, we conclude that there is no evidence that Bunnett is entitled to future lost profits. *See Horizon Health Corp.*, 520 S.W.3d at 860; *see also Luce*, 26 S.W.3d at 566. We sustain Natural Soda's sixth issue.

24

### III.     UNJUST ENRICHMENT

By its first issue, Bunnett contends that the express contract defense bars Natural Soda's unjust enrichment counterclaim as a matter of law. Natural Soda claims Bunnett waived this issue.

### A.     Waiver

As a preliminary matter, Natural Soda argues that Bunnett waived its express contract defense by failing to plead and prove it. Bunnett responds that it did not waive it because it is undisputed that a contract existed between the parties, and the jury found that Bunnett failed to comply with a contract.

The express contract defense is an affirmative defense that a defendant must plead and prove, or it is waived. *See Tricon Tool & Supply, Inc. v. Thumann*, 226 S.W.3d 494, 502 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citing *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 685 (Tex. 2000)). However, a party need not plead and prove its express contract defense if it is undisputed that the damages are covered by a contract. *See Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 723 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (explaining that the plaintiff invoked its rights under the contract in its live pleadings and that the jury answered the breach of contract and excuse questions affirmatively, which necessarily referred to the existence of a contract).

In its pleadings and at trial, Natural Soda claimed that, pursuant to the Agreement, it provided bicarb to Bunnett prior to and after termination of the Agreement on December 2, 2015, and Bunnett failed to pay for that bicarb. Thus, Natural Soda sued Bunnett for breach of contract. In the alternative, Natural Soda sued Bunnett for unjust enrichment

for the same damages. Throughout its case, Natural Soda maintained that the Agreement required for it to provide bicarb to Bunnett for ninety days after termination and that Bunnett was required to pay for it within forty-five days of the invoices. For example, in its objections to the trial court's proposed charge, Natural Soda stated: (1) "The evidence shows that, after termination and pursuant to Section 9.4 [of the Agreement], Natural Soda shipped $3.4 million worth of product to [Bunnett], which [Bunnett] readily accepted (and sold to customers)"; and (2) "The evidence also showed that [Bunnett] has refused to pay for that product, despite its order and acceptance of the product and despite its unequivocal obligation to pay for the product under Section 9.4 [of the Agreement.]" Natural Soda objected to the charge on the basis that "as currently structured, [the charge] does not allow the jury to award Natural Soda damages for [Bunnett's] undisputed breach of the Agreement in the amount of $3.4 million, since that breach occurred *after* the date of termination on December 2, 2015."[10]

As set out above, pursuant to the Agreement, Natural Soda invoked its rights to its damages caused by Bunnett's alleged non-payment of bicarb after the early December 2, 2015 termination. At trial, Natural Soda proceeded under both theories of breach of contract and unjust enrichment and requested that both theories be submitted to the jury. Thus, the jury heard evidence on both theories and made affirmative findings on the question of breach and excuse. As stated above, Natural Soda consistently claimed that its suffered damages after the December 2, 2015 termination as a result of Bunnett's

---

[10] Natural Soda also objected to the trial court's omission to a question on unjust enrichment. The trial court included Natural Soda's proposed question regarding its unjust enrichment claim as follows: "Did Natural Soda perform compensable work for [Bunnett] for which it was not compensated after termination of the [Agreement]." The jury answered, "Yes."

failure to pay for the bicarb as required by the Agreement. The jury found that Bunnett breached the Agreement, but it also found, however, that Bunnett's breach was excused. These findings that Bunnett breached the Agreement after termination and that Bunnett was nonetheless excused from its breach necessarily refer to and support that the jury found the existence of a contract. *See Christus Health*, 359 S.W.3d at 723 (citing TEX. R. CIV. P. 279; *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.— Houston [1st Dist.] 2001, no pet.) (noting that the existence of a contract is essential element of action for breach of contract)). Accordingly, we conclude that under these circumstances, Bunnett was not required to allege an express contract defense as it is undisputed that the Agreement governed the sought-after damages by both parties.[11] *See id*. (concluding that it was unnecessary for the defendant to plead and prove the express contract defense because the plaintiff invoked the contract and the jury found that a contract existed by finding that the defendant breached it).

**B.     Entitlement to Unjust Enrichment Damages**

"Unjust enrichment is an implied-contract theory stating one should make restitution when it would be unjust to retain benefits received." *Christus Health*, 359 S.W.3d at 722–23. Quantum meruit "is founded in the principle of unjust enrichment." *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985). Unjust enrichment and quantum meruit are based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted. *Christus Health*, 359 S.W.3d at

---

[11] Natural Soda also argues that Bunnett should have requested a jury question asking whether the express contract defense applies, and because it did not do so, it cannot assert the defense. We disagree because as explained above, it is undisputed that the Agreement governed the damages Natural Soda sought; thus, Bunnett had no duty to request such an instruction.

723. "[A]n express contract between the parties precludes a plaintiff from recovering for services rendered in quantum meruit if the contract covers those services . . . ." *Id*. Thus, under those circumstances, the party seeking to recover from unjust enrichment may only pursue the legal remedy of breach of contract. *Id*. However, the existence of an express contract does not preclude recovery in quantum meruit for the reasonable value of work performed and accepted which is not covered by an express contract. *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 737 (Tex. 2018)

"When the evidence shows that no contract covers the service at issue, then the question of whether a party may recover in quantum meruit is for the trier of fact." *Christus Health*, 359 S.W.3d at 723. The question of whether an express contract covers the services at issue is a legal question reviewed de novo. *Hill*, 544 S.W.3d at 737.

Citing *Ryland Enter., Inc. v. Weatherspoon*, No. 01-10-00715-CV, 2012 WL 6754966, at *11 (Tex. App.—Houston [1st Dist.] Dec. 28, 2012, no pet.) (mem. op.), Natural Soda argues that the Agreement was rescinded; thus, it was entitled to damages under its quantum meruit claim.[12] However, neither party sought rescission of the Agreement. Thus, this remedy has no bearing on our analysis. Moreover, in *Ryland*, the court specifically stated that the plaintiff sought recovery pursuant to quantum meruit because there was no contract for the services. *Id*. The court noted that the plaintiff could not have pursued a quantum meruit claim "had a valid contract governed this aspect" of the plaintiff's relationship with the defendant. *Id*. (citing *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) and noting "that '[g]enerally speaking, when a valid,

---

[12] "Rescission is an equitable remedy that may be granted upon a number of possible grounds, such as fraud or breach of an executory contract in a material part." *Boyter v. MCR Const. Co.*, 673 S.W.2d 938, 941 (Tex. App.—Dallas 1984, writ ref'd n.r.e.).

express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory' such as quantum meruit").

Therefore, because it is undisputed that Natural Soda sought recovery of the reasonable value of the same goods as expressly provided for in the Agreement under its unjust enrichment and breach of contract theories and a contract existed governing those damages, we must reverse.[13] The only proper claim under these circumstances is a breach of contract claim.[14] Accordingly, we sustain Bunnett's first issue.[15]

## IV.    CHARGE ERROR

By its seventh issue, Natural Soda contends that the trial court improperly instructed the jury that "Natural Soda materially failed to comply with the Agreement on December 2, 2015, by terminating the Agreement in violation of the (10) ten-day

---

[13] Natural Soda correctly states that a party may allege both a breach of contract theory and a quantum meruit or unjust enrichment claim. *See Johnson v. Wells Fargo Bank, NA*, 999 F. Supp. 2d 919, 929 (N.D. Tex. 2014) ("A party can plead legal and equitable claims in the alternative, but only when one party disputes the existence of a contract governing the dispute."); *see also Cooper v. Gates*, No. 3:16-CV-2630-L, 2017 WL 3209452, at *4 (N.D. Tex. Mar. 7, 2017) (mem. op.) (stating that a party can plead legal and equitable claims in the alternative only when one party disputes the existence of a contract governing the dispute). However, if the jury determines that a contract exists for the materials and services provided, the complaining party is limited to collection of those damages for the breach of contract and not entitled to collect those same damages under a quantum meruit theory. *Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 723 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see Ryland Enter., Inc. v. Weatherspoon*, No. 01-10-00715-CV, 2012 WL 6754966, at *11 (Tex. App.—Houston [1st Dist.] Dec. 28, 2012, no pet.) (mem. op.) (noting that the plaintiff could not have pursued a quantum meruit theory of recovery had a valid contract existed); *see also Glass v. Gilbert*, No. 01-14-00643-CV, 2015 WL 3905907, at *5 (Tex. App.—Houston [1st Dist.] June 25, 2015, no pet.) (mem. op.) (explaining that although a fact issue existed as to the plaintiff's unjust enrichment claim, it was only an alternative theory of recovery available if the plaintiff did not prevail on its breach of contract claim). In other words, the plaintiff may only recover under an unjust enrichment theory if there is no contract. *Christus Health*, 359 S.W.3d at 723. And, here the jury necessarily found that a contract existed. *See id*.

[14] Unfortunately for Natural Soda, the jury also found that Bunnett was excused from its breach; thus, awarding no damages to Natural Soda for Bunnett's breach. Natural Soda does not challenge that finding.

[15] Having concluded Natural Soda was not entitled to damages under its unjust enrichment theory as a matter of law, we need not address Bunnett's second issue contending that there is no evidence to support the amount of damages awarded to Natural Soda for unjust enrichment as it is not dispositive. *See* TEX. R. APP. P. 47.1.

provision." By its first issue, Energy contends that the trial court erred by failing to submit a question to the jury regarding Energy's "claim against Natural Soda for participating in breach of fiduciary duty." Energy and Bunnett contend in their third issue that the trial court materially misstated Texas law by instructing the jury "that it was not a breach of fiduciary duty for the general manager while still employed to take active steps to compete with his employer and secretly do so in concert with his employees."[16]

## A. Standard of Review

Texas Rule of Civil Procedure 278 requires the submission of jury questions that are supported by the written pleadings and the evidence. *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002). An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Id*.

We review an allegation of jury charge error for an abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990). A trial court abuses it discretion if its acts are arbitrary, unreasonable, or without consideration of guiding principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex. 2003).

## B. Instruction No. 1

Natural Soda contends that the Agreement's ten-day notice provision did not apply; thus, the trial court improperly instructed the jury that it had violated the Agreement's ten-day termination notice provision.[17]

---

[16] Bunnett has adopted and incorporated in its brief Energy's third issue and supporting argument. However, the complained-of instruction did not apply to Energy. Therefore, we will address this issue for simplicity's sake as Bunnett's issue.

[17] Specifically, Natural Soda states that the ten-day notice provision only applied if it violated section 9.2 of the Agreement. According to Natural Soda, Bunnett breached the Agreement first by violating sections 6.3 and 5.2 of the Agreement, which were not listed in section 9.2. Thus, according to Natural Soda, it had no obligation to provide ten days' notice to Bunnett prior to terminating the Agreement.

30

Instruction No. 1 in the charge states: "You are instructed that Natural Soda materially failed to comply with the Distribution Agreement on December 2, 2015, by terminating the agreement in violation of the (10) ten-day notice provision." During the charge conference, Natural Soda objected to this instruction arguing to the trial court that a question of fact existed concerning whether its failure to provide the ten-day notice constituted a material breach. Natural Soda stated to the trial court that although the trial court had found in its partial summary judgment "that we didn't provide the ten day notice . . . there's still a fact question on who materially breached the contract first." Natural Soda then requested the following instruction and question: "You're instructed that Natural Soda didn't give the ten days' notice. Was that a material breach[?]" In its written proposed jury charge, Natural Soda requested that the charge include the following: (1) "Did Natural Soda materially breach the Animal Feed Distribution Agreement by not providing Bunnett & Co. with 10 days advance written notice of termination on December 2, 2015?"; and (2) Was Natural Soda's lack of 10 days advance written notice of termination of the Animal Feed Distributor Agreement to Bunnett & Co. on December 2, 2015, excused by any of the following?"[18] Thus, in the trial court, Natural Soda conceded that it did not provide the ten-days' notice as required by the Agreement. Natural Soda did not argue to the trial court, as it does on appeal, that the ten-day notice provision did not apply.[19] Therefore, Natural Soda's appellate argument was not preserved and does not comport with its request for the trial court to instruct the jury that

---

[18] Natural Soda listed excuses as follows: (1) prior material breach; (2) repudiation; (3) waiver; and (4) estoppel.

[19] Natural Soda does not cite the record wherein it made this argument, and we have not found such an argument or objection in this voluminous record.

it "didn't give ten days' notice." Natural Soda makes no other arguments to support a conclusion that the trial court improperly instructed the jury that Natural Soda materially failed to comply with the Agreement by not providing the required ten-days' notice.

Moreover, only disputed issues of fact must be submitted to the jury. *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995); *Wright Way Const. Co., Inc. v. Harlingen Mall Co.*, 799 S.W.2d 415, 422 (Tex. App.—Corpus Christi–Edinburg 1990, writ denied) ("A litigant is entitled to have controlling questions of fact submitted to the jury if they are supported by 'some evidence.'"); *see also Bedell v. State*, No. 03-16-00328-CV, 2017 WL 6756996, at *4 (Tex. App.—Austin Dec. 19, 2017, no pet.) (mem. op.). In its partial summary judgment, the trial court determined as a matter of law that Natural Soda had not provided the required ten-days' notice and only reserved for trial whether that failure constituted the first material breach. Thus, Natural Soda's failure to provide the ten-days' notice was not at issue in the trial to the jury.[20] Therefore, we conclude that the trial court did not abuse its discretion, and we overrule Natural Soda's seventh issue.[21]

## C.     Omission of Proposed Questions

By its first issue, Energy contends that the trial court improperly refused to include a question regarding whether Dores complied with his fiduciary duty to Energy. Energy requested this question because it claimed that Natural Soda aided and abetted Dores in

---

[20] On appeal, Natural Soda does not challenge the trial court's partial summary judgment.

[21] By what appears to be a sub-issue to its seventh issue, Natural Soda argues in two sentences, without substantive legal analysis, that the "notice provision was not material" because Bunnett testified during the trial that he did not know the purpose of the ten-day notice provision. *See* TEX. R. APP. P. 38.1(i). We conclude that this issue is inadequately briefed. *See id*.

failing to comply with his fiduciary duty to Energy.[22]

### 1. Pertinent Facts

At the charge conference, Energy informed the trial court that the charge did not mention Energy regarding its breach of fiduciary duty claim against Natural Soda. Energy argued that

> Mr. Dores breached his fiduciary duty. That's the underlying claim under Texas Law in order to recover joint and several liability against a coconspirator, aider or abettor, which is Natural Soda and so there has been no summary judgment on the claim that he owed a fiduciary duty to Energy Feeds. And so that should be included here in this question as: Did a relationship of trust exist between either Bunnett & Company or Energy Feeds or both. However you want to do it, but Mr. Dores' plan was to breach his duty to both companies at the same time and so the first thing we have to prove is whether or not he breached his duty to both companies, and the second thing we have to prove a couple questions in is whether or not Natural Soda participated in that breach and we can talk about the testimony that's come in. Ms. Schaeffner testified just a couple hours ago that she knew how critical it was to get both the bicarb and the fat being sold by the same person. She said it three or four times on the stand. If you look at her contemporaneous e-mails with her boss and Mr. Dores, and her notes—she says, we want these sales guys selling both bicarb for us and bypass fats at the same time and the reason that she wanted that as she testified she knew she needed to be able to send sales reps out there who could sell both products at the same time so when Mr. Dores is breaching his duty to both companies by—by sinking [Energy] and sinking Bunnett & Company at the same time, Natural Soda participated in both of those breaches and that's why both entities need to be included in the instruction and, again, we'll get to the damage.

The trial court asked what evidence specifically exists that supports a finding that Natural Soda did anything related to Energy and opined that Natural Soda's desire for Dores to work there would not be enough evidence as to Energy.

Energy responded:

It's because the employees, Mr. Dores and his two subordinates could not

---

[22] Question No. 14 asked, "Did [Natural Soda] aid and abet Frank Dores' failure to comply with his fiduciary duty, if any, to Bunnett & Co.?" The jury answered, "No."

33

leave Bunnett & Company if they didn't also leave—I'm sorry. I'm saying that backwards. Mr. Dores couldn't leave [Energy] if he didn't also leave Bunnett & Company, which is why the breach of fiduciary duty is the same thing, so, when Natural Soda is encouraging him and assisting him and offering to pay him under the table if he unlawfully competes against Bunnett & Company, that was a necessary part of the assurance that Mr. Dores needed to leave because he could not leave just one entity. Legally speaking, he was the general manager of both. He couldn't leave just one and so what he did was—and, again, we have evidentiary rulings but he reached out to Wawasan and said you're going to cover me on the bypass fats side, right, and he reached out to Natural Soda and said, you're going to cover me on the bicarb side and it took him six months to do it because what happens is he actually reaches out to Wawasan in March and gets assurances from them, oh, absolutely, we'll totally hire you. He doesn't do anything for six months/seven months until October because he was waiting. He needed assurance for both sides. It was not enough. It would not have been enough because Mr. Dores is the reason that Sara Schaeffner believes that she can't sell bicarb without bypass fat and so Mr. Dores was never going to leave these two companies unless he had assurances that he could sell both products at the same time.

The trial court asked, "But is it a breach of fiduciary duty to talk to another employee?" Energy replied that as manager, Dores could not conspire with his subordinates to leave Energy. The trial court informed Energy that it would revisit the issue after it heard all the evidence and it would make a ruling on Energy's objection then.

At the conclusion of the evidence, the trial court denied Energy's proposed questions regarding whether Dores failed to comply with his fiduciary duty to Energy and whether Natural Soda aided and abetted Dores in doing so.[23]

---

[23] In its brief, Energy suggests that either the trial court granted a directed verdict in favor of Natural Soda on its breach of fiduciary duty claim or it committed charge error by excluding the questions concerning its breach of fiduciary claim. Thus, Energy requests that we apply either a directed verdict standard of review or charge error standard of review. After reviewing the record, clearly the trial court declined to include Energy's proposed questions in the jury charge, and we have not found a ruling by the trial court in this voluminous record granting a directed verdict against Energy on its breach of fiduciary duty claim against Natural Soda. Accordingly, we will review the issue as charge error, and we overrule Energy's second issue complaining that the trial court improperly granted a directed verdict in favor of Natural Soda. *See* TEX. R. APP. P. 47.1.

## 2.    Discussion

Energy states that there is ample evidence that Natural Soda encouraged Dores to quit working at Energy and claims, without citing the record in its brief, "numerous emails and notes from telephone calls" exist supporting this finding.[24] Energy also states, "Natural Soda further aided Dores' breach of fiduciary duty by concealing from Bunnett and [Energy] that Dores was intending to resign from the companies." However, Energy does not claim that Dores breached his fiduciary duty to Energy by either planning to resign or by resigning.[25] Thus, even assuming without deciding the evidence shows that

---

[24] In its reply brief, Energy states that Natural Soda's employee, "Schaeffner's notes from October 1, 2015, show that Dores informed [Natural Soda] that he was contemplating resigning from [Energy] and Bunnett," and the notes show that the sales representatives would like to sell bicarb for Natural Soda and would also be "repping bypass fat company." However, the notes do not mention Energy and only refer to Bunnett. Energy also cites in its reply brief a portion of the record where Natural Soda documented that Bunnett's employees approached Natural Soda seeking to sell bicarb for Natural Soda and Natural Soda's desire to hire those employees when they terminated their employment with Bunnett. Energy cites no authority, and we find none, even suggesting that by offering to hire employees who are employed by another company, the hiring company has aided and abetted the employee's breach of fiduciary duty to its employer. Moreover, as further explained below, Energy cannot show harm because the jury heard this same cited evidence regarding Bunnett's claim that Natural Soda aided and abetted Dores's breach of fiduciary duty, and it found that Natural Soda did not do so.

[25] Instead, Energy claims that Dores breached his fiduciary duty by:

- Soliciting his employers' exclusive distributors, Natural Soda and Wawasan;

- Soliciting Ray Gearheart and John Franklin and organizing their resignations in unison;

- Forming a competing enterprise at the same time that he claimed to his employers that he was too sick to work and was taking paid sick leave;

- Reaching an agreement with Bunnett's exclusive distributor, Natural Soda to sell product for Natural Soda independent of Bunnett;

- Reaching an agreement with [Energy's] exclusive distributor, Wawasan, to sell product for Wawasan independently of [Energy] and receiving under the table compensation for his efforts; and

- Failing to disclose any of the foregoing to [Energy].

Energy does not cite evidence supporting a finding that Natural Soda aided and abetted Dores in performing any of the above-stated alleged breaches of fiduciary duty. Thus, even if the evidence showed that Dores

35

Natural Soda knew that Dores intended to resign from Energy, such evidence does not support a finding that Natural Soda aided and abetted Dores's breach of fiduciary duty. In addition, Energy cites no authority, and we find none, supporting a conclusion that an employee breaches its fiduciary duty by either planning to resign or resigning.

Next, Energy states that Natural Soda "[(1)] had extensive discussions with Dores and the other former sales representatives prior to their resignations[,] . . . [(2)] agreed to pay Dores' attorneys' fees in the event . . . [Energy] brought a lawsuit against him, and [(3)] after the lawsuit was filed[,] . . . asserted a common interest privilege with Dores (and in fact, actually paid Dores' litigation defense costs)." Energy further claims that Natural Soda assured Dores that it "would do business with" him and his sales team and not with Bunnett if Dores and his sales team resigned and "spread[] disparaging rumors" to [its] customers . . . undermining customer confidence . . . ." Finally, Energy alleges Natural Soda promised to terminate its Agreement with Bunnett if Dores resigned.[26]

Energy does not provide any citation to the record wherein any evidence was admitted at trial to support the above-stated claims. *See* TEX. R. APP. P. 38.1(h). With this voluminous record, we have "no duty—or even a right—to perform an independent review

---

performed all of those acts, the trial court's refusal to include a question concerning Dores's alleged breaches did not harm Energy because it has not shown that Natural Soda participated in those breaches.

Energy also claims that Dores "[s]olicit[ed] at least one customer on behalf of Natural Soda and in concert with Natural Soda before he resigned." Energy generally cites two pages in the record, without citing the specific evidence that supports such a conclusion. In those two pages, we are unable to locate evidence that supports this assertion.

[26] Energy does not specify whether Natural Soda allegedly promised to terminate the Agreement with Bunnett if Dores resigned from Energy. If the promise was that it would terminate based on Dores's resignation from Bunnett, this alleged act would not have affected Energy.

Energy also complains that Dores provided the phone number of one of Bunnett's customers to Natural Soda, and Natural Soda contacted that customer to discuss the purchase of bicarb while Dores was still an employee of Bunnett. However, this act, even if true, would not have affected Energy because Energy does not sell bicarb and the customer belonged to Bunnett.

36

of the record to determine whether error exists, because to do so would constitute an abandonment of our role as a neutral adjudicator and a transition to party advocate." *Calvillo v. Carrington Mortg. Servs.*, 487 S.W.3d 626, 630 (Tex. App.—El Paso 2015, pet. denied). Accordingly, Energy has not shown that the trial court erred by denying its proposed questions.[27]

Even assuming that the trial court erred in failing to include a question asking if Dores breached his fiduciary duty to Energy, Energy does not explain how it was harmed by the trial court's failure to do so because the jury answered "No" to Question No. 14 asking if Natural Soda aided and abetted Dores's failure to comply with his fiduciary duty to Bunnett. And, Energy does not explain why the jury would have found that Natural Soda did not aid and abet Dores in breaching his fiduciary duty to Bunnett but find that Natural Soda aided and abetted Dores in breaching his fiduciary duty to Energy. Thus, we cannot conclude that the trial court's error, if any, in omitting Energy's proposed question was harmful. *See Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986) ("Alleged error will be deemed reversible only if, when viewed in the light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably

---

[27] Energy states in its brief that Natural Soda "knew that Dores' plan would injure both [Energy] and Bunnett and that to proceed with the plan, Dores would have to breach his fiduciary duties to both [Energy] and Bunnett." Energy neither states which evidence supports a finding that Natural Soda knew that Dores's plan would injure Energy or cause him to breach his fiduciary duty to Energy nor cites the record wherein such evidence was admitted.

Energy makes many vague claims, without citation to the record, that Natural Soda knew Dores's scheme and plans. However, Energy does not connect Natural Soda's acts to any of the alleged ways Dores breached his fiduciary duty to Energy. In order to conclude that the charge required a question asking whether Natural Soda aided and abetted Dores in his breach of fiduciary duty, Energy was required to explain to the trial court and us, citing specific evidence, exactly how Natural Soda aided and abetted Dores's breaches, which it has failed to do. *See* TEX. R. APP. P. 33.1, 38.1(i).

did cause the rendition of an improper judgment."). We overrule Energy's first issue.

## D.     Question No. 13

By its third issue, Bunnett contends that the trial court misstated Texas law by instructing the jury as follows: "An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed and may secretly do so with other employees, without disclosing his plans to his employer." Specifically, Bunnett argues that the instruction "misled the jury by erroneously instructing them not to consider when reaching a verdict much of the conduct that was most relevant to [Bunnett's] claims against [Natural Soda]."

At the charge conference, Natural Soda requested an instruction in the jury charge stating that an employee does not breach a fiduciary duty "by merely leaving employment with [a] company." Specifically, in its proposed questions, Natural Soda requested inclusion of the following: "An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed and may secretly do so with other employees, without disclosing his plans to his employer." Bunnett and Energy did not object to Natural Soda's proposed instruction.[28] The next day, Bunnett informed the trial court that it had "a couple of comments on the charge" and stated

> In particular, there's just a few on the breach of fiduciary duty. The instruction is lawful for Mr. Dores to coordinate with subordinates in departing that is contrary to Averitt Trucking.[29] Um, we've got the Texas Law that says you can't do that. The instruction says it is not a breach of fiduciary duty to coordinate with cohorts when leaving.

---

[28] Bunnett, however, requested a definition of fiduciary duty pursuant to the pattern jury charge, which the trial court subsequently granted.

[29] Neither party has provided a citation to a case with the style "Averitt Trucking," and we are not able to find such a case.

Natural Soda replied, "that language that we proposed is straight out of caselaw. I think its verbatim." Later, after the trial court presented its final charge to the parties, Bunnett objected to the instruction on the basis that the case law relied upon by the trial court "is not about a manager." Bunnett made no other arguments to the trial court regarding this instruction.

Question No. 13 states the following:

Did Frank Dores fail to comply with his fiduciary duty to Bunnett & Co.?

Frank Dores complied with his fiduciary duty if during his employment with Bunnett & Co.:

1.      The way Frank Dores interacted with Bunnett & Co. and their customer and suppliers was fair and equitable to Bunnett & Co.; and

2.      Frank Dores made reasonable use of the confidence that Bunnett & Co. placed in him; and

3.      Frank Dores acted in the utmost good faith and exercised the most scrupulous honesty toward Bunnett & Co.; and

4.      Frank Dores placed the interests of Bunnett & Co. before his own and did not use the advantage of his position to gain any benefit for himself at the expense of Bunnett & Co.; and

5.      Frank Dores fully and fairly disclosed all important information to Bunnett & Co. concerning his interactions with Bunnett & Co., and their customers and suppliers.

An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed and may secretly do so with other employees, without disclosing his plans to his employer. An at-will employee does not breach any fiduciary duties to his employer by merely leaving employment with the employer.

Answer "Yes" or "No": _____

The jury answered, "Yes."

First, Bunnett argues that "the inaccurate statement of law and unduly narrow

definition of the ways Dores could have breached his obligations resulted in an inaccurate and unduly narrow understanding by the jury of the ways [Natural Soda] could have aided in those breaches" and "went to the very heart of the liability theory presented against them." At trial, Bunnett objected to the instruction on the basis that the caselaw which the trial court relied upon did not involve a manager, "[t]he instruction is lawful for Mr. Dores to coordinate with subordinates in departing that is contrary to Averitt Trucking," and Texas law does not allow employees to "coordinate with cohorts when leaving."[30] Thus, the basis of Bunnett's argument centered on its claim that the instruction was a misstatement of Texas law. Bunnett did not specifically object on the basis that "the instruction was an unduly narrow definition of the ways Dores could have breached his obligations"; therefore, error on that basis, if any, is waived. *See Saenz-Guerrero v. Gardner*, 587 S.W.3d 191, 194 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (explaining that the "objecting party must clearly designate the alleged error and specifically explain the basis of its objection" and "[o]bjections to the charge and requests for instructions must comport with the arguments made on appeal" (citing *Burbage v. Burbage*, 447 S.W.3d 249, 256–58 (Tex. 2014))). Moreover, Bunnett has not shown that the instruction is an inaccurate statement of the law as it is directly quoted from *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201 (Tex. 2002). The instruction correctly sets out the law as stated in *Johnson* that an employee does not breach a fiduciary duty to an employer by taking active steps to compete while still employed and secretly doing so with other employees without informing the employer. *Id*.

Next, Bunnett argues that the trial court erred by failing to provide "any clarification

---

[30] This is the extent of Bunnett's argument to the trial court.

to the instruction" and "essentially instructed the jury that Dores could take active steps to compete without any qualification or limitation." As we understand it, Bunnett complains that the trial court improperly omitted limiting or qualifying language as stated in *Johnson*. *Id.* at 202. However, Bunnett did not present a written request asking the trial court to include the proposed qualifying or limiting language it now claims was needed in the jury charge.[31] Thus, error, if any, is waived.[32] *See Gilgon, Inc. v. Hart*, 893 S.W.2d 562, 565–66 (Tex. App.—Corpus Christi–Edinburg 1994, writ denied) (explaining that rule 278 "specifically addresses two additional requirements for preserving error in the failure to submit a definition or instruction:" (1) "the party complaining of the judgment must have presented a written request that the omitted definition or instruction be included in the charge"; and (2) the complaining party "must have also tendered the proposed definition or instruction in substantially correct wording").

Finally, Bunnett argues that as the general manager, Dores "is subject to a higher fiduciary standard than a mere employee." In support of this argument, quoting *Abetter Trucking Co. v. Arizpe*, Bunnett states: "'If the nature of a [fiduciary's] preparation to compete is significant, it may give rise to a cause of action for breach of fiduciary duty.'" *See* 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.). This is the

---

[31] Specifically, Bunnett argues that the jury charge should have also included the following: "An employer may not (1) appropriate company trade secrets; (2) solicit the former employer's customers while still working for his employer; (3) solicit the departure of other employees while still working for his employer; or (4) carry away confidential information." *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 202 (Tex. 2002).

[32] Energy states in its reply brief that it did not waive this issue because it provided the trial court with a correct proposed jury charge. However, the proposed jury charge Energy submitted to the trial court does not include the above-stated language. Therefore, Energy and Bunnett's argument complaining of the trial court's omission of the above-stated language is waived because they failed to present a written request asking that the omitted instruction be included in the charge. *See Gilgon, Inc. v. Hart*, 893 S.W.2d 562, 565–66 (Tex. App.—Corpus Christi–Edinburg 1994, writ denied).

41

extent of Bunnett's argument. Bunnett does not explain with substantive legal analysis why the nature of Dores's preparation to compete was significant and how his "significant" preparation to compete barred the trial court's instruction, which is an accurate statement of the law. *See Johnson*, 73 S.W.3d at 201. And, although Bunnett generally cites *Abetter Trucking Co.*, 113 S.W.3d at 510, it does not explain how this case applies to the facts here.[33] *See* TEX. R. APP. P. 38.1(i). Accordingly, we cannot conclude that Bunnett has met its burden of showing that the trial court's inclusion of the instruction in the jury charge was arbitrary, unreasonable, or without consideration of guiding principles.[34]

Nonetheless, Bunnett claims it was harmed by inclusion of the complained-of instruction because the jury was deprived from finding that Dores: (1) solicited Bunnett's customers; (2) solicited Bunnett's exclusive suppliers; (3) solicited Bunnett's sales representatives; (4) engaged in behavior that went beyond mere preparations to compete; and (5) engaged in a course of conduct designed to hurt Bunnett. We disagree.

All of these alleged acts fit squarely within the charge's instruction. These acts support a finding that Dores breached his fiduciary duty to Bunnett because (1) he did not place the interests of Bunnett before his own, (2) used his position to gain any benefit for himself at the expense of Bunnett, and (3) did not fully and fairly disclose all important information to Bunnett concerning his interactions with Bunnett and their customers.

---

[33] *Abetter Trucking Co. v. Arizpe*, does not concern an improper jury charge instruction. *See* 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.). In addition, nothing in *Abetter* supports a conclusion that the complained-of instruction was an inaccurate statement of the law or erroneous. *See id*. Instead, it appears that Bunnett's real complaint is that the trial court omitted the exceptions to the general rule that an employee does not breach his fiduciary duty by planning on competing, making preparations to compete, and secretly doing so with other employees without informing its employer. *Johnson*, 73 S.W.3d at 202. However, as further discussed above, neither Bunnett nor Energy submitted a written request for the exceptions to be included in the charge. *See Gilgon, Inc.*, 893 S.W.2d at 565–66.

[34] We note that despite the complained-of instruction's inclusion in the jury charge, as previously stated, Bunnett prevailed on the question.

42

Evidence that Dores solicited Bunnett's customers, exclusive suppliers, and sales representatives shows that Dores used his position to gain a benefit for himself at the expense of Bunnett and did not fully and fairly disclose all important information to Bunnett concerning his interactions with Bunnett and their customers. In addition, assuming for the sake of argument the evidence shows that Dores engaged in behavior that went beyond mere preparation to compete and was designed to hurt Bunnett, that evidence obviously supports a finding that Dores did not place the interests of Bunnett before his own. Moreover, the jury implicitly made such findings when it found that Dores breached his fiduciary duty to Bunnett. We conclude that Bunnett has not shown on appeal that the error, if any, probably caused the rendition of an improper judgment or prevented it from properly presenting its case on appeal. *See Gunn v. McCoy*, 554 S.W.3d 645, 675 (Tex. 2018). Accordingly, even assuming error, we cannot conclude that Bunnett was harmed. *See id*. We overrule Bunnett's third issue.[35]

## V. ELECTION OF DAMAGES

By its fourth issue, Bunnett contends that the trial court erred in requiring it to elect its damages. Although it prevailed on its tort claim, Bunnett elected to collect damages under breach of contract. Bunnett argues that because Natural Soda engaged in two separate acts of (1) terminating the Agreement and (2) disparaging Bunnett to its customers, it is entitled to separate recoveries under both a breach of contract theory and tortious interference with relationships theory. Natural Soda responds that Bunnett would receive double recovery for the same injury of lost profits if Bunnett did not elect damages.

---

[35] Although not affected by the inclusion of Question No. 13, we overrule Energy's third issue arguing that the complained-of instruction was erroneous and caused it harm for the same reasons as set out above.

43

We agree with Natural Soda.

> A party may sue and seek damages on alternative theories of liability. If a plaintiff pleads alternate theories of liability, a judgment awarding damages on each alternate theory may be upheld if the theories depend on separate and distinct injuries and if separate and distinct damages findings are made as to each theory. "Under the one-satisfaction rule, [however,] a plaintiff is entitled to only one recovery for any damages suffered because of a particular injury." Although the traditional "one satisfaction" principle applies to cases in which an injured plaintiff is wholly compensated by settling defendants or other third parties, as described in *Utts* . . . , other Texas Supreme Court authorities use the term to describe the process by which the trial court elects the remedy which affords an injured plaintiff the most favorable relief against a single defendant when multiple theories of liability cause an indivisible injury. The latter rule applies when a defendant commits technically different acts that result in a single injury. "When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief."

*Madison v. Williamson*, 241 S.W.3d 145, 158–59 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

At trial, Bunnett relied on the same evidence to support its claim for lost profits under both theories of recovery. Under its breach of contract theory, Bunnett sought the profits it claimed it lost in projected sales to all its customers in 2015; while in its tortious interference with relationships claim, it sought the profits it claimed it lost in projected sales to five customers in 2015. The damages awarded by the jury for breach of contract included Bunnett's lost profits from those same five customers. Thus, if the trial court had not required Bunnett to elect its damages, Bunnett would have been compensated twice for the same injury—lost profits from the five companies. *See id*. at 159.

Moreover, it was Bunnett's burden at trial to distinguish between the damages it suffered as a result of Natural Soda's breach of contract and tortious interference with relationships with Bunnett's customers. *See Saden v. Smith*, 415 S.W.3d 450, 467 (Tex.

App.—Houston [1st Dist.] 2013, pet. denied). On appeal, Bunnett does not cite where the evidence showed its damages for its breach of contract claim were separate and apart from its damages for its tortious interference with relationships claim. *See id*.; *see also* TEX. R. APP. P. 38.1(i). In addition, Bunnett does not cite where in the record it attempted to segregate damages attributable to Natural Soda's breach of the parties' Agreement from any other damages that somehow may have been attributable to Natural Soda's separate interference with Bunnett's relationships with its customers. *See Saden*, 415 S.W.3d at 467. To prevail on appeal, Bunnett must show that the way this case was presented, tried, and charged to the jury, the actual evidence showed separate and distinct injuries resulting in separate and distinct lost profits. *See id*. However, Bunnett has failed to do so. *See* TEX. R. APP. P. 38.1(i). Accordingly, we overrule Bunnett's fourth issue.[36]

## VI.    EXEMPLARY DAMAGES

By its fifth issue, Bunnett contends that although it elected to receive its breach of contracts damages, it was not prohibited by the one satisfaction rule from collecting its exemplary damages. Natural Soda replies that it is obvious that exemplary damages can only be recovered if the party elects to collect its damages in tort.

Bunnett seeks to collect exemplary damages awarded by the jury for Natural

---

[36] By its fourth issue, Natural Soda contends in the event that Bunnett's contract claim is invalidated, there is no evidence to support the jury's finding that it tortiously interfered with the relationships with J.D. Heiskell, Mission Ag. Resources, LLC, Nutrius LLC, Pacific Elements, or Hi-Pro Feeds, which are customers and prospective customers of Bunnett. Specifically, Natural Soda challenges each element of the tortious interference claim arguing there is no evidence that: (1) there was a reasonable probability that Bunnett would have entered into a business relationship with the above-listed customers; (2) Natural Soda intentionally interfered with those relationships; (3) Natural Soda's conduct was independently tortious or unlawful; (4) the interference proximately caused Bunnett's injury; and (5) Bunnett suffered actual damages or loss as a result. By its fifth issue, Natural Soda challenges the jury's award of exemplary damages. However, this issue is not dispositive, as we have concluded that Bunnett was required to elect its damages and chose to do so under its contract claim. *See* TEX. R. APP. P. 47.1.

Soda's tortious conduct even though it elected to collect damages pursuant to its breach of contract claim. Bunnett argues that as exemplary damages are meant to punish and deter parties from wrongful conduct, it should be allowed to collect them even though it did not choose to receive damages for Natural Soda's tortious conduct. However, it is well-settled that a party cannot recover exemplary damages or mental anguish for a breach of contract claim. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006). As there is no authority directly on point supporting Bunnett's argument, and the case law clearly states that exemplary damages are not recoverable for breach of contract, we decline to reach such a conclusion. *See id*. We overrule Bunnett's fifth issue.[37]

## VII. CONCLUSION

We reverse the portions of the judgment awarding Natural Soda damages for quantum meruit and awarding Bunnett damages for future lost profits, and we render a take-nothing judgment on those damages. We affirm the judgment in all other respects.


JAIME TIJERINA,
Justice


Delivered and filed the
23rd day of April, 2020.

---

[37] Bunnett argues that the exemplary damages calculation should have included "the entire economic harm caused by the defendants." In sum, Bunnett, citing § 41.008, argues the exemplary damages needed to have been calculated by adding the amount of contract damages with the amount of tort damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008 (capping exemplary damages to an amount equal to the greater of: (1) two times the amount of economic damages plus an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000). However, as we have concluded that Bunnett cannot collect both its contract and tort damages and that it is not entitled to exemplary damages under its contract claim alone, this issue is not dispositive to this appeal. *See* TEX. R. APP. P. 47.1.